(C.D. 3972)

SPRAGUE ELECTRIC CO.; CORNELL-DUBILIER ELECTRONICS, DIV. OF FEDERAL PACIFIC ELECTRIC CO.; JEFFERS ELECTRONICS DIV., AIRCO SPEER (FORMERLY SPEER CARBON CO.)

*v.*

UNITED STATES (MONTGOMERY WARD & CO., PARTY-IN-INTEREST)

United States Customs Court, Second Division

(Decided February 27, 1970)

*Lincoln & Stewart* (*Eugene L. Stewart* of counsel) for the plaintiffs.

*William D. Ruckelshaus*, Assistant Attorney General (*Frederick L. Ikenson*, trial attorney), for the defendant.

*Ronald S. Platt; Barnes, Richardson & Colburn* (*Joseph Schwartz* and *E. Thomas Honey* of counsel) associated counsel; for the party-in-interest.

Before Rao, Ford, and Newman, Judges

Ford, Judge: This action by American manufacturers is brought pursuant to provisions contained in 19 U.S.C., section 1516(b). The merchandise involved was imported by Montgomery Ward & Co., the

party-in-interest, and is described on the invoice as ceramic capacitors by the Japanese manufacturer, KCK Co. Ltd. The regional commissioner of customs at the port of New York classified said capacitors under the provisions of item 685.80, Tariff Schedules of the United States, which provides as follows:

685.80 Electrical capacitors, fixed or variable____ 12% ad val.

Plaintiffs contend the merchandise involved is subject to duty at 27 per centum ad valorem under item 535.14, Tariff Schedules of the United States, which provides as follows:

Schedule 5, Part 2, Subpart D:

|  | Ceramic magnets, ceramic electrical insulators whether or not in part of metal, and other ceramic electrical ware, including ferroelectric and piezoelectric ceramic elements: |  |
|---|---|---|
| * * * | Porcelain insulators, with metal parts cemented thereto and comprising not less than 30 percent of the weight thereof, used in high-voltage, low-frequency electrical systems_____ | * * * |
| * * * | Ferrites_____ | * * * |
| 535.14 | Other_____ | 27% ad val. |

The pertinent portion of the headnote to schedule 5, part 2 states:

Part 2 headnotes:

1. This part covers ceramic wares, and articles of such wares and, in addition, certain unshaped refractory material (subpart A) closely related thereto.

2. For the purposes of the tariff schedules—

(a) a "ceramic article" is a shaped article having a glazed or unglazed body of crystalline or substantially crystalline structure, which body is composed essentially of inorganic nonmetallic substances and either is formed from a molten mass which solidifies on cooling, or is formed and subsequently hardened by such heat treatment that the body, if reheated to pyrometric cone 020, would not become more dense, harder, or less porous, but does not include any glass article;

It is not disputed by plaintiffs that the imported merchandise is in fact capacitors but it is their contention that ceramic capacitors are excluded from item 685.80, *supra*, because of headnote 1(iii) of schedule 6 part 5 which reads as follows:

Part 5 headnotes:

1. This part does not cover—

* * * * * * *

(iii) ceramic electrical ware (part 2D of schedule 5); * * *.

The record herein consists of the testimony of three witnesses called on behalf of plaintiffs and seven exhibits received in evidence. The ruling on the admission in evidence of collective exhibit 8 for identification was reserved. Collective exhibit 8 consists of photostatic copies of notes purported to be made by the president of KCK the manufacturer involved. We sustain the objection to the admission of said documents on the ground that they are hearsay and irrelevant. Said documents are not admissible as an exception to the hearsay rule as a declaration against interest and their contents are at best meaningless to the court and are therefore irrelevant.

Plaintiffs' collective exhibit 1 consists of correspondence directed to establishing compliance with the jurisdictional requirement of an American manufacturer to institute proceedings in this court. Plaintiffs' collective exhibit 2 consists of photographs of KCK capacitors made at the office of the commodity specialist at the port of New York. Plaintiffs' exhibit 3 consists of a brochure put out by KCK depicting its capacitors. The exhibit was limited to the photographic portion of the brochure. Plaintiffs' exhibit 4 consists of a display board depicting the various components and stages of manufacture of American made capacitors. Plaintiffs' exhibit 6 is a photostatic copy of a quotation of prices to Sprague of Wisconsin Inc. from KCK Co. Ltd. Collective exhibit 7 is a box of KCK capacitors and components. Plaintiffs' exhibit 9 is a display of the various components and stages of manufacture of an American manufacturer.

The oral testimony of three well qualified witnesses called on behalf of plaintiffs has established that capacitors are used in electronic circuits and have no other use. Their use is to isolate direct current or voltage fields from one another and permit the passage of higher frequency currents. A capacitor also stores an electric charge. The measurement of the capacity of the capacitor is in farads, microfarads or picofarads. The amount of the charge is dependent upon the dielectric which in this instance is the ceramic. The dielectric material in ceramic capacitors is barium titanate in a crystalline vitreous state.

The manufacture of ceramic capacitors starts with a ceramic disc which is purchased domestically or imported upon which a silver paint is screened and then passed through a firing furnace to bond the silver to the disc. Wire leads are then attached to the silvered disc to enable it to be utilized in electronic circuits. A resin is then applied to the body of the capacitor. Prior to the addition of the leads, the ceramic discs or silver ceramic discs are not electrical articles. The witnesses were of the opinion based upon their manufacturing experience in the United States that the ceramic disc was the component material in chief value. Mr. Peck, called on behalf of plaintiff, however admitted he is not familiar with the prices of supplies used by KCK or the

quantities it purchased or if said firm makes or purchases the materials it uses for its capacitors. Plaintiffs' witness, Mr. Kirschner, admitted he did not know the price in Japan of silver paint in producing capacitors.

Before consideration is made as to the merits of plaintiffs' claim, it should be stated there does not appear to be objection to the status of plaintiffs. The papers contained in plaintiffs' collective exhibit 1 coupled with the testimony of record establishes to the satisfaction of the court that plaintiffs are proper parties to institute the action before the court pursuant to the provisions of 19 U.S.C., section 1516(b).

There is no dispute that the imported articles are in truth and in fact capacitors. This is so not only by plaintiffs' admission but also by the presumption of correctness which attaches to the customs classification of the importation as capacitors. Flowing from the presumption is the fact that the classifying officer found all facts necessary to so classify the involved capacitors. For plaintiffs to prevail in this action it was incumbent upon them to establish not only that the classification was erroneous but that the claimed provision is correct. *United States* v. *Cody Manufacturing Co., Inc., et al.*, 44 CCPA 67, C.A.D. 639 (1957); *Hayes-Sammons Chemical Co.* v. *United States*, 55 CCPA 69, C.A.D. 935 (1968).

It is the contention of plaintiffs that classification of so-called ceramic capacitors is excluded from item 685.80, *supra*, by virtue of headnote 1(iii) of schedule 6 part 5, *supra*, which provides that said part does not include ceramic electrical ware. Plaintiffs urge the imported capacitors are ceramic electrical ware, and classification in said part 5 accordingly is erroneous. The court has before it for determination the question of what was intended by Congress to be encompassed within the term "ceramic electrical ware." Upon reviewing the various headnotes contained in the Tariff Schedules of the United States, we note that no definition or explanation of the term is to be found. However, we do find in schedule 5 part 2 headnote 2 a definition of ceramic article, *supra*.

Plaintiffs in effect contend that the imported capacitors are composed of ceramic discs and since the function of a capacitor is to store electrical energy, they are ceramic electrical ware. Counsel for plaintiffs appear to have no difficulty in arriving at the conclusion that the imported merchandise falls within the language ceramic electrical ware as is evidenced by the following headings in their brief:

I. The Imported Merchandise Was Erroneously Classified as Electrical Capacitors, Fixed or Variable, Under Item 685.80 TSUS

    A.   The Imported Merchandise Consists of Ceramic Capacitors Which Are "Ceramic Electrical Ware" Within the

Meaning of Headnote 1(iii) of Headnotes to Part 5, Schedule 6, TSUS Which Exclude Such Articles from Classification Under the Said Part in Which Item 685.80 Is Contained.

1. The imported merchandise consists of ceramic capacitors whose essential operating properties as a capacitor are based upon the presence of ceramic material as the principal ingredient.

2. The imported ceramic articles are "electrical" because in accordance with their intended purpose they perform a useful function in an electrical circuit.

3. The imported ceramic electrical articles are a class of manufactured article having in common the presence of ceramic as the predominant material and the performance of an electrical function in a circuit, and accordingly are ceramic electrical *ware*. [Italics quoted.]

Predicated upon these points it is contended that no ambiguity exists in the relevant statutory language and therefore resort to extrinsic aids to determine its meaning is improper. *J. M. Altieri* v. *United States*, 62 Cust. Ct. 91, C.D. 3687, 295 F. Supp. 269 (1969). We are, of course, in accord with the principle cited. However, we do not find it applicable in the instant case. We are of the opinion that the language in issue is far from explicit and sufficiently ambiguous to warrant clarification from extraneous sources. Apparently even plaintiffs' own witness, Peck, was not entirely clear about the meaning of the expression "ceramic electrical ware" as the following testimony indicates:

Q. Have you even been in the ceramic electrical ware business?— A. I have been in the ceramic capacitors business for many years.

Q. Have you ever bought or sold anything as ceramic electrical ware?—A. You mean under the title ceramic electrical ware?

Q. Yes, sir.—A. We don't use that expression in our specific class, which is ceramic capacitors.

Q. Do you know whether anybody uses the expression ceramic electrical ware?—A. I don't know anybody that specifically uses that expression in commerce.

When ambiguity does exist it is proper to refer to Tariff Commission explanations as legislative history. *Rifkin Textile Corp.* v. *United States*, 54 CCPA 138, C.A.D. 925 (1967). Reference is also permissible to the so-called "Brussels Nomenclature" when the superior heading appears to have been derived from said source. *Herbert G. Schwarz, dba Ski Imports* v. *United States*, 57 CCPA 19, C.A.D. 971 (1969).

The Interim Report of the United States Tariff Commission in con-

nection with its Tariff Classification Study makes the following comment with respect to component material:

(a) *Classification by component material.*—The tariff status of an article may depend upon whether it is "wholly or in chief value of" a specified material such as glass, wood, metal, cotton, wool, etc. It is said that the process of identifying with certainty the exact materials incorporated in a manufactured article and establishing the relative values thereof commonly leads to dispute. It is also said that this concept tends at times to produce unanticipated results. An example given to illustrate the latter complaint is that a golfer's caddy cart with an aluminum frame may be admitted as a manufacture of metal, while one with a wooden frame may be subject to duty as a wood product at a totally different rate.

Duty rate descriptions of articles according to their component material of chief value is probably the most widely used method of description in the tariff schedules. These descriptions appear in a variety of forms such as "composed wholly or in chief value of _____," "manufactures in chief value of_____," etc. Paragraph 1559(b) of the Tariff Act, as amended, provides that "The words 'component of chief value', wherever used in this Act, shall be held to mean that component material which shall exceed in value any other single component material of the article involved; and the value of each component material shall be determined by the ascertained value of such material in its condition as found in the article." It is peculiar that this definition is literally concerned only with the definition of the words "component of chief value," which words are rarely used in the tariff schedules. Moreover, this definition does not in any sense dispose of the questions which are involved in the component-material-of-chief-value method of tariff description.

The foregoing method of tariff description has resulted in disputes, and there are also instances where unanticipated results have been produced. It is doubtful, however, that a general indictment can be returned against this descriptive method. Standardization of the terms used where this descriptive method is desired and an improved definition may be helpful in overcoming some of the difficulties involved.

As a result of the foregoing observation, the submitting report of the Tariff Commission makes the following comment:

In the proposed schedules, the problems associated with the chief-value concept have been reduced substantially, but have not been entirely eliminated. However, a material improvement has been brought about by standardization of language. Also, the incidence of such descriptions has been significantly and realistically curtailed by the proposed shift from the chief-value concept to weight as the basis for classifying metal alloys and composite articles of two or more base metals, and by "carving out" from the various existing "basket" provisions based on component ma-

terial of chief value many new classes of articles and providing for them at a single compromise rate wherever possible regardless of the component material. Another device employed in the proposed schedules to stabilize classifications based on component material of chief value is, by means of appropriate headnotes, to narrow the field of competing materials. Also, words connoting the preexistence of component materials have been avoided.

The Explanatory Notes, schedule 5 part 2, makes the following comment about subpart D involved herein:

Subpart D embraces certain important classes of industrial ceramics. Items 535.11 and 535.14 embrace ceramic electrical articles, covered by items 534.21 (ceramic magnets) and 534.25 (other) in the draft published for the hearing. These provisions have been completely revised as a result of information received at and subsequent to the hearing. It was learned that significant imports of large porcelain insulators are being classified as articles in chief value of metal in paragraph 353 of the tariff act at a rate of 15 percent ad valorem. In line with the general effort to avoid, whenever possible, the classification uncertainties incident to the "chief value" concept, information was obtained from the importer of such insulators and from U.S. producers of similar insulators, on which to base an objective description of the insulators being imported under paragraph 353. The description in item 535.11 was developed from such information. Item 535.14, other ceramic electrical articles, includes not only other porcelain and subporcelain, but articles such as ferrites. Item 535.14 embraces any ceramic electrical articles of porous ceramic ware, whether earthenware, now dutiable in paragraph 211 at about 25 percent ad valorem, or other ware, now dutiable in paragraph 214 at 15 percent ad valorem. Imports of all such ware are likely to be negligible.

*Item 535.14 does not embrace switches, fuses, receptacles, lamp sockets, resistors and other electrical articles which are to be connected into electrical circuitry.* (These are specifically provided for in part 5 of schedule 6.) Item 535.14 does not include ceramic wall plates for electric switches, or electric lamp bases; such articles are chiefly used for ornamental purposes, and are in subpart C of this part. *With the exception of certain insulators, item 535.14 would cover for the most part ceramic articles practically as they come from the final firing, or possibly after subsequent minor processing such as grinding or shaping.* [Emphasis supplied.]

From the foregoing data, it is apparent that in the past classification based upon component material has resulted in disputes and unanticipated results. In order to prevent this, the new schedules have attempted to substantially reduce such provisions. Where component material is still a basis for classification appropriate headnotes have been provided to narrow the field of competing materials.

The Explanatory Notes, *supra*, shed some light on what was intended to be covered by schedule 5 part 2 subpart D and what was not intended

to be covered thereby. The latter category significantly points out that item 535.14, *supra*, was not intended to encompass a number of articles set forth *eo nomine* which are provided for under items 685.80 and 685.90, Tariff Schedules of the United States, resistors which are provided for in item 686.10, Tariff Schedules of the United States, and other electrical articles which are to be connected into electrical circuitry. There is no dispute herein that the imported capacitors are used solely in electrical circuitry. Therefore, unless component material is the controlling factor in classification, it is obvious that capacitors fixed or variable must find classification under item 685.80, *supra*, as classified. This is particularly so since an *eo nomine* classification without terms of limitation includes all forms of such article unless a contrary legislative intent is established. *Smillie & Co.* v. *United States*, 11 Ct. Cust. Appls. 199, T.D. 38966 (1921) ; *Charles T. Wilson Co., Inc.* v. *United States*, 38 CCPA 19, C.A.D. 433 (1950). The only limitation imposed by the language of item 685.80 is that the capacitor be fixed or variable. There is no requirement with respect to the component material. In addition, under General Interpretative Rule 10(c), the provision which most specifically describes the article, controls. Under previous statutes see *United States* v. *Astra Trading Corp.*, 44 CCPA 8, C.A.D. 627 (1956) ; *United States (Lansen-Naeve Corp. a/c Albert Klingelhofer, Party-in-Interest)* v. *Simon Saw & Steel Co.*, 51 CCPA 33, C.A.D. 834 (1964). An *eo nomine* provision which more specifically provides for the article is preferred over a general descriptive provision and a provision having requirements more difficult to satisfy is controlling. The provisions of item 685.80, *supra*, more specifically describe the article in terms of its name, character and function while the claimed classification is under a general descriptive provision. The provision under which classification was made has requirements which are more difficult to satisfy.

Plaintiffs contend that component material was in fact considered in the classification of ceramic capacitors and quotes five rulings of the Commissioner of Customs relating to various ceramic articles including ceramic capacitors. These rulings were made under the Tariff Act of 1930 and plaintiffs contend were before the Tariff Commission and Congress when the Tariff Schedules of the United States was enacted. Prior classification under such ceramic provisions coupled with the following language of the Tariff Commission in its Explanatory Notes is deemed by plaintiffs as confirming their position that only capacitors in chief value of metal were intended to be covered by item 685.80:

> Item 685.80 covering electrical capacitors involves no rate change. Item 685.90 provides, without rate change, for electrical apparatus for making or breaking electrical circuits, for the pro-

tection of electrical circuits, or for making connections to or in electrical circuits and also provides for switchboards (other than telephone switchboards) and control panels. Items 686.10 and 686.20 provide without rate change for resistors and automatic voltage regulators, respectively.

It is, however, also to be noted that some four pages prior to the above in said Study the following explanatory statement is made:

This part includes many new provisions specifically covering various electrical articles and electrical components of articles which are presently classifiable under various general tariff descriptions, "parts" provisions, and "basket" provisions usually based upon component material of chief value. The provisions often clash head-on and produce uncertain and anomalous classification results.

The foregoing would seem to suggest that component material was not intended to be a significant criterion in the classification of electrical components or articles. Consequently the fact of prior classification of ceramic capacitors under schedule 2 of the Tariff Act of 1930 and the Tariff Commission's statement that no rate change was involved do not necessarily support the contentions of plaintiffs. All other indicia seem clearly to say that Congress intended to include all capacitors, regardless of component material, within item 685.80, *supra*, and we so conclude.

Supporting this result is the information contained in the so-called Brussels Nomenclature under the heading (85.18) electrical capacitors, fixed or variable. This is the identical language used in item 685.80, *supra*, and is explained as follows:

Electrical capacitors (or condensers) consist in principle of two conducting surfaces separated by an insulating material (dielectric), e.g., air, paper, mica, oil, resins, ceramics or glass.

They are used for various purposes in many branches of the electrical industry (e.g.:—to improve the power factor of A.C. circuits; to protect electrical contacts from the effects of arcing; for storing and releasing given quantities of electricity; in oscillating circuits; in frequency filters; and very largely in the radio, television and telephone industries).

Their characteristics (shape, size, capacitance, nature of dielectric, etc.) vary according to their intended use. The heading, however, covers all capacitors whatever their intended use (including standard capacitors used in laboratories, specially made within fine limits and designed to remain constant during use).

In any event based upon the record as made herein classification under item 535.14, *supra*, is untenable. Both counsel for defendant and the party-in-interest urge that classification as other ceramic electrical ware is controlled by the definition of ceramic article con-

tained in headnote 2(a) part 2 schedule 5, *supra*, and we agree with this contention.

The explanation of said headnote is set forth in the First Supplemental Report of the Tariff Classification Study as follows:

REFERENCE No. 6–Vol. 2, p. 359; Vol. 7, p. 61:

Part 2 headnote 2(a) defining *ceramic article* is amended by inserting in the last two lines "by such heat treatment that the body, if reheated to pyrometric cone 020, would not become more dense, harder, or less porous," in lieu of "by heating to a temperature of over 1200° F,".

Explanation: A significant characteristic of a ceramic article which distinguishes it from other mineral products is the relatively high temperature which it undergoes in its production. Because the heat treatment of ceramic articles is a function of both time and temperature a question has been raised regarding the administration of the published definition of "ceramic article". It is not unusual in the ceramic industries to refer to a heat treatment in terms of the maximum temperature reached (about 1200° F. or higher) even though the duration of commercial firing to a given temperature varies considerably. Ceramic heat treatments, however, are more commonly referred to in terms of pyrometric cone equivalent.

A pyrometric cone is a triangular pyramid formed from a nonmetallic mineral composition which indicates by its deformation the extent of the heat treatment it has undergone. These cones are made in a series of compositions which deform at different temperatures. The deformation temperature, however, depends somewhat upon the rate at which the temperature is increased. For example, pyrometric cone 020 deforms at 1157° F. if the temperature is increased 108° F. per hour and at 1175° F. if the temperature is increased 270° F. per hour. Thus pyrometric cones measure the effect of both the temperature and the time of heat treatment.

It can be determined if an article is a ceramic article by measuring the physical properties of pieces of the body of such an article before and after reheating them to cone 020. If the body of the article has not previously had sufficient heat treatment to qualify it as a ceramic article, the density and hardness of the pieces will increase and their absorptivity and volume will decrease.

The great majority of ceramic articles when produced receive heat treatments considerably greater than the minimum heat treatment described in the amended definition, because such a minimum heat treatment would leave most ceramic compositions too fragile to be of commercial value. Only very infrequently should an article need testing to determine if it has received a heat treatment sufficient to qualify as a ceramic article.

It is apparent from the foregoing that for an article to fall within the term ceramic article proof must be offered to establish its compliance with this definition. The record is devoid of any evidence of the method of manufacture of the ceramic discs in the country of origin which would bring the imported capacitors within the statutory description of ceramic articles. We do have some evidence of the manufacturing process employed by plaintiffs in the United States but such evidence does not establish that the imported article falls within the definition.

The question of whether the provision for ceramic electrical ware is limited to articles wholly or in chief value of ceramic is debated at some length by all parties, especially in view of General Headnote 9(f) (i). We have carefully considered the respective arguments and have reached the conclusion that the language employed was intended to refer to articles wholly or in chief value of ceramics. In our view the phrase "ceramic electrical ware" has the same meaning as if the provision had read electrical ware of ceramic. We are fortified in this view by the circumstance that where in this subpart Congress intended otherwise, as in the case of insulators, the phrase "whether or not in part of metal" was inserted.

Component material is determined as of the time when nothing further remains to be done except final assembly. *Kaplan Products & Textiles, Inc.* v. *United States*, 49 Cust. Ct. 145, C.D. 2376 (1962), aff'd *Same* v. *Same*, 51 CCPA 2, C.A.D. 828 (1963).

With this understanding, it is interesting to note that the submitting report in considering component material made the following observation:

> * * * Sometimes the chief-value description presents troublesome questions as to the order and nature of the processing steps involved abroad in the production of the article. Differences in production techniques and changing cost factors from time to time or from producer to producer (especially in different countries) may result in like articles being classified differently.

Since there is no evidence as to the cost of material in Japan at a time when nothing further remains to be done except final assembly the court is not in a position to determine the component material of said capacitors. As indicated, *supra*, the costs vary from manufacturer to manufacturer and country to country; hence the testimony relative to the costs in the United States is insufficient to establish component material in chief value.

In addition to the foregoing and based upon the Explanatory Notes, schedule 5, part 2, subpart D, quoted, *supra*, the imported capacitors do not appear to fall within the class of articles intended to be covered

by the claimed provision. On the contrary the Explantory Notes indicate that the articles covered therein are ceramic articles "practically as they come from the final firing, or possibly after subsequent minor processing such as grinding or shaping." The record herein establishes after the firing of the ceramic disc the capacitor is screened with silver paint and then fired after which lead wires are attached and a resin coating is applied. These additions are in our opinion more than "minor processing" and are indicative of the type of article intended to be excluded from schedule 5 part 2.

In view of the foregoing we are of the opinion that plaintiffs have failed to overcome the presumption of correctness attaching to the classification. The protest is therefore overruled.

Judgment will be entered accordingly.